UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY HILTUNEN,

                Plaintiff,        Civil Action No. 14-13315
                                     Honorable Marianne O. Battani
                                     Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [18, 19]**

      Plaintiff Kimberly Hiltunen ("Hiltunen") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [18, 19], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.    RECOMMENDATION**

      For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Hiltunen is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [19] be GRANTED, Hiltunen's Motion for Summary Judgment [18] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II. REPORT

### A. Procedural History

On February 7, 2012, Hiltunen filed an application for DIB, alleging a disability onset date of January 1, 2008. (Tr. 135-37). This application was denied initially on June 14, 2012. (Tr. 81-84). Hiltunen filed a timely request for an administrative hearing, which was held on March 4, 2013, before ALJ Tammy Thames. (Tr. 27-63). Hiltunen, who was represented by attorney John Wildeboer, testified at the hearing, as did vocational expert Carrie Anderson. (*Id.*). On April 18, 2013, the ALJ issued a written decision finding that Hiltunen is not disabled. (Tr. 11-22). On July 27, 2014, the Appeals Council denied review. (Tr. 1-4). Hiltunen timely filed for judicial review of the final decision on August 26, 2014. (Doc. #1).

### B. Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled

2

>regardless of age, education, or work experience.
>
>Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
>Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**C.     Background**

>*1.     Hiltunen's Reports and Testimony*

At the time of the administrative hearing, Hiltunen was 38 years old and at 5'2" tall weighed 318 pounds. (Tr. 30-31, 42). She lived in a house with her husband and daughter. (Tr. 31, 203). She completed high school but had no additional education. (Tr. 31, 192). Hiltunen stopped working on December 19, 2011, when her employment was terminated for excessive absenteeism. (Tr. 31, 39). Prior to that time, she had been working as a stockperson at Walmart on a part-time basis. (Tr. 32).

Hiltunen alleges that her medical problems – which include Crohn's disease, diabetes, back pain, heel spurs, headaches, asthma, anxiety, and depression – began in January 2008. (Tr. 32, 191). Flare-ups of her Crohn's disease, which happen two to four days per month, cause nausea, cramping, and frequent diarrhea. (Tr. 39-40, 42). When these flare-ups occur, Hiltunen testified that she is "mostly bedridden for the day" due to pain and discomfort. (Tr. 42). At the time of the hearing, however, Hiltunen was not taking any medication for Crohn's, aside from

3

over-the-counter Imodium. (Tr. 40). She was taking tramadol, Flexeril, and Tylenol for her back and foot pain, but testified that these medications were not particularly helpful. (Tr. 41, 43).[1] She was taking glipizide for diabetes, saying that this condition was "managed pretty well" on oral medication; however, she admitted that she did not regularly check her blood sugars (although she was "supposed to"). (Tr. 43-45). Hiltunen also testified that she suffers from headaches, which can last anywhere from one to seven days each. (Tr. 45-46).

Hiltunen indicated that she has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, seeing, using her hands, and with memory, completing tasks, concentration, understanding, and following instructions. (Tr. 56, 208). She can sit for only ten minutes before back pain requires her to change position. (Tr. 57). She is able to drive, care for her dog, and perform some household chores, such as laundry, washing dishes, preparing meals, shopping, and vacuuming, but these tasks take her longer than they used to. (Tr. 51-53, 204-06). She enjoys reading and watching television, attends church regularly, and is able to pay bills and handle a checking and savings account. (Tr. 207).[2]

### 2. Medical Evidence

The Court has thoroughly reviewed Hiltunen's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 3. Vocational Expert's Testimony

Carrie Anderson testified as an independent vocational expert ("VE") at the administrative hearing. (Tr. 58-62). The ALJ asked the VE to imagine a claimant of Hiltunen's

---

[1] Hiltunen testified, however, that these medications do not cause her any side effects. (Tr. 54).

[2] In a third party function report dated February 24, 2012, Hiltunen's husband, Greg Hiltunen, generally corroborated his wife's statements. (Tr. 215-22).

4

age, education, and work experience, who could perform light work, with the following additional limitations: she is able to stand and/or walk with normal breaks for a total of two hours in an eight-hour workday; she is able to sit with normal breaks for a total of six hours in an eight-hour workday; she requires a sit/stand option enabling her to change positions every 30-45 minutes; she can occasionally push and pull with her bilateral lower extremities; she can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; she can frequently balance; she must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and pulmonary irritants; she should avoid concentrated exposure to hazards such as dangerous machinery or unprotected heights; and she is limited to work that consists of simple, routine, and repetitive tasks that involve no more than occasional interaction with the public or coworkers. (Tr. 59-60). The VE testified that the hypothetical individual would not be capable of performing any of Hiltunen's past relevant work. (Tr. 60). However, the VE testified that the hypothetical individual would be capable of working in the jobs of storage lease processor (1,400 jobs regionally), ticket seller (1,360 jobs), and internal courier clerk (1,670 jobs). (*Id.*).

D. **The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Hiltunen is not disabled under the Act. At Step One, the ALJ found that, since December 19, 2011, Hiltunen has not engaged in substantial gainful activity.[3] (Tr. 13-14). At Step Two, the ALJ found that Hiltunen has the severe impairments of plantar fasciitis, diabetes, major depressive disorder, social anxiety disorder, Crohn's disease, and obesity. (Tr. 14). At Step Three, the ALJ found that Hiltunen's

---

[3] The ALJ also found that from January 1, 2008 (Hiltunen's alleged onset date) to December 19, 2011, Hiltunen was engaged in substantial gainful activity. (Tr. 13). Consequently, she concluded that Hiltunen was not disabled under the Act during this period of time. (*Id.*).

5

impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 14-16).

The ALJ then assessed Hiltunen's residual functional capacity ("RFC"), concluding that she is capable of performing light work, with the following additional limitations: she is able to stand and/or walk with normal breaks for a total of two hours in an eight-hour workday; she is able to sit with normal breaks for a total of six hours in an eight-hour workday; she requires a sit/stand option enabling her to change positions every 30-45 minutes; she can occasionally push and pull with her bilateral lower extremities; she can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs, but can never climb ladders, ropes, or scaffolds; she can frequently balance; she must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, and pulmonary irritants; she should avoid concentrated exposure to hazards such as dangerous machinery or unprotected heights; and she is limited to work that consists of simple, routine, and repetitive tasks that involve no more than occasional interaction with the public or coworkers. (Tr. 16-21).

At Step Four, the ALJ determined that Hiltunen is unable to perform her past relevant work. (Tr. 21). At Step Five, the ALJ concluded, based in part on the VE's testimony, that she is capable of performing a significant number of jobs that exist in the national economy. (Tr. 21-22). As a result, the ALJ concluded that Hiltunen is not disabled under the Act. (Tr. 22).

**E. Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact

unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by

substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion'").

**F.     Analysis**

In her motion, Hiltunen argues that the ALJ erred in:  (1) finding that she was engaged in substantial gainful activity ("SGA") up until December 19, 2011; (2) improperly discounting certain medical opinions; and (3) citing her receipt of unemployment benefits as one reason her allegations of disability were not fully credible.  (Doc. #18 at 7-28).  Each of these arguments will be addressed in turn.

*1.     Substantial Evidence Supports the ALJ's Finding That Hiltunen Engaged in SGA Until December 19, 2011*

As set forth above, at Step One of the sequential analysis, the ALJ found that Hiltunen engaged in SGA from her alleged onset date through December 19, 2011, and, thus, applied the remainder of the sequential evaluation process only to the period after that date.  (Tr. 13-14). Although Hiltunen's argument is phrased somewhat vaguely, it appears that she is challenging the ALJ's finding that she engaged in SGA for the first four years of her period of alleged disability.

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  The Social Security Administration has defined

earnings levels that constitute SGA for each calendar year. *See* 20 C.F.R. §404.1574(a), (b); *Program Operations Manual System* ("POMS") §DI 10501.015(B). Evidence that a claimant earned in excess of these levels creates a rebuttable presumption that she engaged in SGA. *See Smith v. Astrue*, 2011 WL 3897800, at *1 (E.D. Mich. Sept. 6, 2011) (citing *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 246 (6th Cir. 1996)). Here, the ALJ noted that Hiltunen earned $14,982 in 2008, $12,148 in 2009, $9,721 in 2010,[4] and $15,857 in 2011. (Tr. 13, 146, 150). Hiltunen does not challenge the ALJ's conclusion that all of these earnings exceed the applicable thresholds in their respective years. (Tr. 13). Thus, it was Hiltunen's burden to rebut the presumption with competent evidence that these earnings constituted SGA. *See Bell*, 105 F.3d at 246; *Keyes v. Sullivan*, 894 F.2d 1053, 1056 (9th Cir. 1990) ("The claimant may rebut a presumption based on earnings with evidence of his inability to be self-employed or to perform the job well, without special assistance…").

In her motion, Hiltunen argues that, despite her earnings, her work between 2008 and 2011 does not constitute SGA because it was performed under "special conditions." (Doc. #18 at 19). The regulations cited by Hiltunen provide as follows, in relevant part:

> The work you are doing may be done under special conditions that take into account your impairment, such as work done in a sheltered workshop or as a patient in a hospital. If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity …. Examples of the special conditions that may relate to your impairment include, but are not limited to, situations in which –
>
> \*      \*      \*
>
> (2) You were allowed to work irregular hours or take frequent rest periods.

---

[4] As the ALJ noted, Hiltunen's work in 2010 was performed over no more than nine months, as she did not work in August, September, or October of that year. (Tr. 13, 152, 155-56). Thus, the $9,721 she earned that year exceeds the $1000 per month average necessary to constitute SGA in 2010. *See* POMS §DI 10501.015(B).

20 C.F.R. §404.1573(c). However, after citing this provision of the regulations, Hiltunen merely states, in conclusory fashion: "Plaintiff's work was done under special conditions. Plaintiff was allowed multiple periods of [Family and Medical Leave Act of 1993 ("FMLA")] leave. This is the equivalent of 'irregular hours.'" (Doc. #18 at 19). Hiltunen cites no authority for this proposition, and the Court is aware of none. Indeed, courts have interpreted 20 C.F.R. §404.1573(c) to apply when the accommodations provided by the employer "are so great that the employee is keeping his position only through the employer's grace rather than because of any valuable service provided to the employer." *Fitzpatrick v. Colvin*, 2013 WL 6869502, at *2 (W.D. Wis. Dec. 31, 2013) (citing *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1031 (6th Cir. 1990)). Here, where Hiltunen's former employer was merely complying with its obligations under the law in providing leave to which she was statutorily entitled, it cannot be said that she maintained her employment only through the grace of her employer or that she was not providing any valuable service in return for the compensation she received.

In sum, Hiltunen's unsupported conclusory assertion that she was working under "special conditions" is belied by the evidence and – in any event – is insufficient to rebut the presumption that she engaged in SGA. Thus, the ALJ's conclusion that Hiltunen engaged in SGA up until December 19, 2011, is supported by substantial evidence.[5]

---

[5] Hiltunen also asserts that the ALJ failed to consider the "episodic nature" of her Crohn's disease in considering whether she engaged in SGA. (Doc. #18 at 15-19). Specifically, she appears to argue that her intermittent absences from work between 2008 and 2011, due to Crohn's flare-ups, amount to a "series of unsuccessful work attempts," rather than SGA. (*Id.*). The regulations provide, however, that if a claimant sustains SGA-level work for more than six months, it cannot be considered an unsuccessful work attempt, regardless of why it ended or was reduced to the non-SGA level. *See* 20 C.F.R. §404.1574(c)(5). Thus, where the evidence cited by Hiltunen herself (Doc. #18 at App'x B) establishes that she worked long stretches of time in between flare-ups, in excess of six months each, her argument that she had a "series of unsuccessful work attempts" is without merit.

        2.    *Substantial Evidence Supports the Weight*
              *Accorded to the Opinions in the Record*

Hiltunen also argues that the ALJ erred in weighing various medical opinions in the record. (Doc. #18 at 7-25). Specifically, Hiltunen asserts that the ALJ erred in (1) giving little weight to two opinions of her treating physician, Dr. Stevens (*Id.* at 7-14); (2) rejecting statements "holding [her] off work" during the period she engaged in SGA (*Id.* at 15-20); (3) giving little weight to the Global Assessment of Functioning[6] ("GAF") scores in the record (*Id.* at 20-22); and (4) giving limited weight to the opinion of consultative psychological examiner Dr. Brady (*Id.* at 22-25). Each of these arguments will be addressed in turn.

        a.    *Substantial Evidence Supports the ALJ's Decision*
            *To Give Little Weight to Dr. Stevens' Opinions*

The record contains two medical opinions issued by Hiltunen's treating physician, Floyd Stevens, D.O. (Tr. 438, 509-10). Specifically, on July 27, 2012, Dr. Stevens completed a Medical Source Statement, in which he opined that Hiltunen can occasionally lift less than ten pounds, stand or walk for less than two hours in an eight-hour workday, must alternate between sitting and standing, requires an assistive device, and is moderately limited in pushing and pulling. (Tr. 438). Dr. Stevens stated that these limitations had been present for at least six years and would disrupt Hiltunen's ability to perform a regular job at least three-quarters of the time. (*Id.*). A few months earlier, on November 11, 2011, Dr. Stevens completed a Certification of Health Provider, opining that Hiltunen could not perform prolonged ambulation or standing, heavy lifting, or reaching, and that she would miss 2.5 days of work per month. (Tr. 509-10). Hiltunen argues that the ALJ erred in giving little weight to these opinions. (Doc. #18 at 7-14).

---

[6] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

Courts have recognized that an ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakely*, 581 F.3d at 406 (internal quotations omitted). While treating source opinions are entitled to controlling weight under these circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence."). If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. §404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion)).

In this case, the ALJ specifically considered Dr. Stevens' July 2012 opinion and explained that she gave it little weight because it was inconsistent with (1) the medical evidence of record; (2) Hiltunen's own statements about her capabilities; (3) the fact that she was able to perform SGA until December 2011; and (4) Dr. Stevens' own statement in November 2010 that she could work without restrictions. (Tr. 19). Similarly, the ALJ considered Dr. Stevens' November 2011 opinion that Hiltunen could not perform prolonged ambulation or standing, heavy lifting, or reaching, and that she would miss 2.5 days of work per month; she gave this

opinion little weight because (1) the medical evidence established that Hiltunen could perform light lifting and was able to stand or walk for up to two hours in an eight-hour workday; and (2) the statement regarding Hiltunen's absences was inconsistent with the medical evidence of record, including a lack of significant findings during the consultative examination and lack of treatment for Crohn's disease during the relevant time period. (Tr. 19). Substantial evidence supports both of these conclusions.

Inconsistency with the record is a proper reason to discount a treating physician's opinion. *See Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 276 (6th Cir. 2002); *Bruce v. Comm'r of Soc. Sec.*, 2011 WL 833792, at *3 (E.D. Mich. Mar. 4, 2011). As the ALJ found, Dr. Stevens' July 2012 opinion that Hiltunen had been unable to perform even sedentary work since at least 2006 (Tr. 438) was wholly inconsistent with her demonstrated ability to perform at SGA levels through December 2011. (Tr. 19). Moreover, the ALJ correctly noted that this portion of Dr. Stevens' opinion was also inconsistent with his own statement in November 2010 that Hiltunen was able to work without restrictions. (Tr. 19, 498). Indeed, between November 2010 and July 2012, Dr. Stevens routinely noted that Hiltunen's gastrointestinal examinations were normal (Tr. 298-300) and that, at times, her symptoms improved (Tr. 296). Thus, the ALJ gave good reasons for discounting Dr. Stevens' 2012 opinion, and these reasons are supported by substantial evidence.

The ALJ also discounted Dr. Stevens' November 2011 opinion, in part because of its inconsistency with the "lack of significant findings during the consultative examination." (Tr. 19, 428-431, 510). The record supports this conclusion. At her June 5, 2012 consultative examination with A. Neil Johnson, M.D., Hiltunen reported suffering from asthma, obesity, back pain, heel pain, and Crohn's disease. (Tr. 428). She reported having tried several different

13

medications for Crohn's, which either did not work or caused side effects. (*Id.*). She indicated that she suffered from diarrhea anywhere from three times a day to seven times an hour. (*Id.*). Dr. Johnson then noted that, despite these complaints, Hiltunen "[a]mazingly" still weighed 317 pounds. (*Id.*). On examination, Hiltunen's abdomen was normal, but she had mild difficulty getting on and off the examination table, moderate difficulty heel and toe walking, and severe difficulty squatting. (Tr. 429). Her range of motion was generally within normal limits, her sensation was intact, and she demonstrated full strength. (Tr. 430). In conclusion, Dr. Johnson noted that Hiltunen was not currently receiving treatment for her Crohn's disease and again commented that it was "striking" that she was "able to maintain such severe obesity" given her reports of such frequent diarrhea. (Tr. 431). In summary, then, Dr. Johnson's findings were relatively normal and certainly were not consistent with Dr. Stevens' 2011 opinion that Hiltunen was severely limited.[7]

In light of the good reasons cited by the ALJ for discounting Dr. Stevens' July 2012 and November 2011 opinions, Hiltunen raises several other arguments, none of which are meritorious. For example, Hiltunen argues that the ALJ erred in rejecting Dr. Stevens' November 2011 opinion that she would miss 2.5 days of work per month, asserting that this portion of his opinion was "not just a prognostication of frequency of future flare-ups, but a statement of the historical pattern of past flare-ups." (Doc. #18 at 8). Even accepting this premise as true, Hiltunen's argument misses the mark, because she was able to work at SGA levels through December 2011, despite the extent of her alleged absenteeism. Thus, Dr. Stevens'

---

[7] Hiltunen asserts that the ALJ should not have put stock in the "lack of significant findings during the consultative examination," arguing that her Crohn's disease was "quiescent" at the time of this examination. (Doc. #18 at 9). However, there is no indication from Dr. Johnson's report that this was the case. (Tr. 428-31). Indeed, at a visit to her treating physician just one month earlier, Hiltunen reported that she was still "frequently" experiencing nausea and abdominal cramps, which suggests otherwise. (Tr. 514).

opinion that she would need to miss work with this frequency is not necessarily indicative of disability under the Act. Similarly, Hiltunen argues that the ALJ erred in discounting Dr. Stevens' opinions based on her "lack of treatment for Crohn's disease." (*Id.* at 9). However, the treatment notes cited by Hiltunen in support of her argument that she was receiving treatment for this condition date back to 2008 – during which time she was still engaging in SGA – and, thus, are not particularly relevant. Finally, Hiltunen seems to repeatedly suggest that the ALJ failed to consider the fact that Dr. Stevens' opinions detailed *potential* limitations if her Crohn's disease flared up, which did happen periodically. (*Id.* at 8-11). In reality, however, the ALJ properly noted that the medical record does not document evidence of significant limitation-enducing Crohn's flare-ups after Hiltunen ceased engaging in SGA in December 2011. (Tr. 19, 296, 428-31 (noting no significant limitations in June 2012), 439-40 (opining in August 2012 that Hiltunen could perform a reduced range of light work), 514-15, 519). As the Commissioner correctly argues, it is this evidence "of what actually happened between December 19, 2011 and April 18, 2013, rather than what *could* have happened during a potential flare, that the ALJ properly found inconsistent with Dr. Stevens' opinions." (Doc. #19 at 21 (emphasis in original)). For all of these reasons, the ALJ's decision to give Dr. Stevens' opinions little weight is supported by substantial evidence.

> b. *Substantial Evidence Supports the ALJ's Rejection of Statements "Holding [Hiltunen] Off Work" During the Period She Engaged in SGA*

The ALJ also noted in her decision that the record "contains multiple doctors' notes holding the claimant off work"; however, she gave these "opinions" little weight because (1) they were intended to be only temporary restrictions, and (2) Hiltunen in fact returned to work after they were issued. (Tr. 20 (citing Tr. 441-510)). Hiltunen argues that the ALJ erred in rejecting these opinions, vaguely asserting that the ALJ should have given more weight to the

"multiple absences from work caused by flares of her Crohn's disease." (Doc. #18 at 15). This argument lacks merit. The record is clear that Hiltunen did return to work at SGA levels after each note was issued. (Tr. 459-63 (January 2008), 464-65 (August 2008), 466-67 (February 2009), 468 (June 2009), 469-72 (July 2009), 473-76 (January 2010), 477-80 (March 2010), 481-97 (July – October 2010), 498 (indicating in November 2010 that Hiltunen could return to work without restrictions)). Thus, substantial evidence supports the ALJ's decision to afford limited weight to these doctors' notes, as they indicated only a *temporary* inability to work.

### c. Substantial Evidence Supports the ALJ's Decision To Give Little Weight to Hiltunen's GAF Scores

In her decision, the ALJ noted that Hiltunen "was issued multiple global assessment of functioning (GAF) [scores] of 50, indicating serious symptoms or serious limitations in functioning." (Tr. 20 (citing Tr. 422-25, 540, 553)). However, the ALJ gave little weight to these assessments, because GAF scores are "highly subjective and non-standardized" and do not assign corresponding functional limitations. (Tr. 20). Hiltunen argues that the ALJ erred in dismissing these GAF scores, asserting that she should have weighed them as medical opinions.[8] (Doc. #18 at 20-22). This is simply incorrect, as the relevant authority makes clear that an ALJ's failure to credit – or even to acknowledge – a GAF score does not require remand. *See Guyaux v. Comm'r of Soc. Sec.*, 2014 WL 4197353, at *23 (E.D. Mich. Aug. 22, 2014) ("Courts in this

---

[8] Although Hiltunen does not cite to any authority in support of this proposition, it appears that she is relying on Administrative Message 13066 ("AM-13066"), dated July 22, 2013, which states in part, "We consider a GAF rating as opinion evidence." However, this Court has recently rejected this argument in a similar case, where (like here) the ALJ's decision was issued prior to the promulgation of AM-13066. *See Bryce v. Comm'r of Soc. Sec.*, 2014 WL 1328277, at *9 (E.D. Mich. Mar. 28, 2014). Moreover, the *Bryce* court clearly stated that a GAF score, standing alone, need not be given much weight: "[u]nless the clinician clearly explains the reasons behind his or her GAF rating, and the period to which the rating applies, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis." *Id.* at *10 (internal citations and quotations omitted). Thus, Hiltunen's argument that her GAF scores should have been weighed as medical opinions is unpersuasive.

district do not accord controlling weight to GAF scores."); *Bryce v. Comm'r of Soc. Sec.*, 2014 WL 1328277, at *9 (E.D. Mich. Mar. 28, 2014); *Kornecky*, 167 F. App'x at 511 (court indicated it was not "aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place"). Thus, the ALJ reasonably rejected Hiltunen's GAF scores because they were highly subjective, non-standardized, and did not correspond to any functional limitations.

### d. Substantial Evidence Supports the ALJ's Decision To Give Little Weight to Dr. Brady's Opinion

Hiltunen also argues that the ALJ erred in giving only "limited probative weight" to the May 27, 2012 opinion of the consultative psychological examiner, Michael Brady, Ph.D. (Doc. #18 at 22-25). At her examination with Dr. Brady, Hiltunen reported struggling with anxiety and depression for the past few years due to family problems and physical limitations. (Tr. 422). She complained of constant fatigue, diminished libido, decreased motivation, sleep disturbances, irritability, and social anxiety when in public or near crowds of people. (*Id.*). Dr. Brady performed a mental status examination and concluded that Hiltunen's ability to relate and interact with others was impaired; her ability to understand, recall, and complete tasks and expectations was not significantly impaired; her ability to concentrate was impaired; her ability to withstand normal stressors associated with the work setting was somewhat impaired; and that, as a result of her emotional state, she could be distracted and her effectiveness and performance would likely be limited and slowed. (Tr. 425). Dr. Brady diagnosed Hiltunen with major depressive disorder and social anxiety disorder and assessed a GAF score of 50. (*Id.*).

In her decision, the ALJ explained that she gave limited weight to Dr. Brady's opinion because it was inconsistent with the medical evidence, including Hiltunen's lack of significant mental health treatment and her own reported abilities. (Tr. 20). This conclusion is borne out by

the record. For instance, Dr. Brady noted in his own report that Hiltunen had no history of mental health treatment or psychiatric hospitalizations. (Tr. 422). And, although Hiltunen did see at counselor at List Psychological Services from August through December 2012 (Tr. 534-55), this is the only period of time during which she received mental health treatment throughout her alleged period of disability. Moreover, Hiltunen's counselor's observations during this series of visits is also inconsistent with Dr. Brady's opinion that her performance would be limited and slowed, as the counselor consistently rated Hiltunen's mental functioning as stable (as opposed to even mildly impaired). (Tr. 544-55). The ALJ properly found that these records – the only medical evidence of mental functioning in the record – were inconsistent with Dr. Brady's opinion. *See* 20 C.F.R. §404.1527(c)(4). Additionally, as the ALJ noted, Dr. Brady's opinion was inconsistent with Hiltunen's own reported ability to follow instructions, read, watch television, manage her finances, shop in stores, and attend church services. (Tr. 20, 206-08). For all of these reasons, substantial evidence supports the ALJ's decision to give limited probative weight to Dr. Brady's opinion.

### 3. The ALJ Did Not Err in Considering Hiltunen's Receipt of Unemployment Benefits When Evaluating Her Credibility

Lastly, Hiltunen argues that the ALJ erred in "finding that [her] receipt of unemployment benefits indicated an ability to work." (Doc. #18 at 26). Contrary to Hiltunen's argument, however, the ALJ did not determine that Hiltunen was able to work simply because she received unemployment benefits. Rather, in evaluating the credibility of Hiltunen's allegations of disability, the ALJ permissibly considered the fact that, during the relevant period of time, Hiltunen represented – in conjunction with her application for unemployment benefits – that she was capable of working. (Tr. 18). It was proper for the ALJ to consider the inherent inconsistency of these competing representations. *See Soc. Sec. Rul. 96-7p*, 1996 WL 374186, at

18

\*5 (July 2, 1996) ("One strong indication of the credibility of an individual's statements is their consistency …."). Indeed, as this court previously has noted, the Sixth Circuit has specifically held that seeking unemployment benefits and disability benefits at the same time is inconsistent. *See Arnold v. Comm'r of Soc. Sec.*, 2015 WL 477379, at \*10 (E.D. Mich. Feb. 5, 2015) (citing *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004) and *Bowden v. Comm'r of Soc. Sec.*, 1999 WL 98378, at \*7 (6th Cir. Jan. 29, 1999)). Here, where Hiltunen's receipt of unemployment benefits was just one factor among many that the ALJ considered in evaluating her credibility, and where Hiltunen has articulated no other challenges to the ALJ's credibility finding, it is entitled to deference. *See Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001) (an ALJ's credibility determination will not be disturbed "absent compelling reason").

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

### III. CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [19] be GRANTED, Hiltunen's Motion for Summary Judgment [18] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: June 23, 2015  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
　　　　　　　　　　　United States Magistrate Judge


### NOTICE REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific

objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 23, 2015.

                             s/Eddrey O. Butts
                             EDDREY O. BUTTS
                             Case Manager